# United States Court of Appeals
## For the Eighth Circuit
_____

No. 19-2549
_____

United States of America

*Plaintiff - Appellee*

v.

Robert Lewis

*Defendant - Appellant*
_____

Appeal from United States District Court
for the Northern District of Iowa - Waterloo
_____

Submitted: September 25, 2020
Filed: September 30, 2020
_____

Before SMITH, Chief Judge, BENTON and KOBES, Circuit Judges.
_____

BENTON, Circuit Judge.

Robert Lewis was convicted of conspiracy to distribute a controlled substance under 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846, and sentenced to 360 months in prison. He appeals. Having jurisdiction under 28 U.S.C. § 1291, this court affirms.

# I.

At trial, nine witnesses testified for the government. Many acknowledged cooperating for a reduced sentence. The out-of-state drug supplier, M.P., testified he provided meth by mail. He said that Blue Schmitt, then-leader of the enterprise, brought him into Schmitt's "circle of trust," introducing him to Lewis and other friends. Schmitt gathered Lewis and others to plan for Schmitt's leaving the enterprise. A coconspirator, C.W., testified that Schmitt "was going to go on the run and that I would ultimately take over. All the methamphetamine that Blue [Schmitt] was getting I would now get and distribute." According to C.W., Lewis "would help me out, that it would be me that was responsible but that he would be the one to help me out to deliver and pick up the money." The supplier, M.P., testified he asked Lewis "if he would take over" from Schmitt. Lewis told M.P. that C.W. "was going to take over the enterprise" and "was going to get help from. . . . Lewis." Lewis promised M.P. that he would "look out for – making sure that [C.W.] was doing things okay." M.P. believed Lewis meant "he would make sure that [C.W.] wouldn't overspend the money that was not his."

C.W. testified that after he took over, "Ultimately, I was responsible for receiving all the methamphetamine, and I was responsible for paying for it." He said he received a six-to-ten-pound shipment each week. He gave Lewis half to "deliver to the certain people that he knew" and for personal use. Lewis did not have a driver's license. A coconspirator testified he was Lewis's "taxi driver. If he needed to go somewhere, I gave him a ride. If he needed to drop some meth off or drugs off, I would give him a ride. Whatever he needed to do." C.W. said he hired a second driver to take Lewis "around to deliver methamphetamine and pick up money."

Lewis participated in the enterprise with C.W. for a "couple months, three months," according to C.W. Their relationship ended because Lewis "wouldn't bring in the money, wouldn't keep track of who he took the ounces to," and did not repay C.W. for drugs Lewis kept for personal use.

In addition to testimony, the government offered records of phone calls and text messages to Lewis from coconspirators. The government also offered a video of a traffic stop, and a package of meth mailed by a coconspirator to Lewis.

The district court[1] instructed the jury that a guilty defendant was "responsible for . . . any methamphetamine that fellow conspirators actually distributed or agreed to distribute during the conspiracy that was reasonably foreseeable as a necessary or natural consequence of the conspiracy." The jury found Lewis guilty of conspiracy to distribute meth.

After trial, Lewis moved for new trial based on newly discovered evidence. He offered an affidavit of an inmate, L.G., who overhead two government witnesses "comparing their stories of what they were going to testify to in court. . . . rehearsing their stories and . . . joking about how they were going to stick Robert Lewis with all of this." L.G. also heard one witness "talking to somebody on the phone and telling them what was going on in the courtroom that day," saying, "Lewis is really stupid and is going to get a lot more time in prison."

The district court held an evidentiary hearing on the motion. L.G. testified about his affidavit that "some of the details in here are inaccurate"—including that he heard government witnesses "talking and comparing their stories of what they were going to testify to in court." He testified that "the conspiring and rehearsing their stories, I don't remember them doing that." Instead, "What I heard was just they would come back from . . . court . . . and were just . . . comparing what had happened in the courtroom." L.G. overheard them saying only "how stupid they thought Bob [Lewis] was. . . . just generally speaking," and not "specifically to an issue." L.G. testified he did not "specifically" hear the witnesses say that "they were going to stick Robert Lewis with all of this." Also, L.G. said the only phone call he overheard was one witness saying that "when they were in the courtroom or something when nobody was around or when everybody had their backs to him . . . [Lewis] mouthed the words 'I'm going to kill you'" to the witness. Jail call records also contradicted L.G.'s affidavit.

---

[1]The Honorable Leonard T. Strand, Chief Judge, United States District Court for the Northern District of Iowa.

At the end of the hearing, the district court made a "factual finding" on L.G.'s lack of credibility: "I don't believe a word [L.G.] said. I think he will say whatever is necessary depending on who is talking to him and how he thinks he might benefit at the time." L.G. "was a horrible witness. He had to think about everything. It appeared to me that he had perjury concerns running through his brain. . . . I've never seen a witness so unsure about how to answer even basic questions. My credibility finding at this point is basically [L.G.] has none." The district court denied Lewis's motion for new trial.

At sentencing, C.W. testified that Lewis threatened him with physical harm for cooperating with the government. According to C.W., after he testified at trial, Lewis repeated "for an hour continuously" that C.W. "was going to find out what happened to rats when you get to prison." Lewis also "mouthed the words 'you're a dead man'" to him. Another government witness, M.P., testified that Lewis told other inmates that M.P. was a cooperating witness, causing them to threaten him. M.P. heard "Lewis had put a $50,000 hit on my head. . . . to kill me."

The district court found a base offense level of 38. It found Lewis responsible for 21.77 kilograms of meth, crediting C.W.'s trial testimony on drug quantity. The district court granted enhancements, including for drug quantity, manager-or-supervisor role, and obstructing justice. With all enhancements, Lewis's offense level would be 45, but the guidelines limited it to 43. *See* **U.S.S.G. Ch. 5, Pt. A** (Sentencing Table). For an offense level of 43, the guidelines recommended a life sentence. *Id.* The district court granted Lewis a downward variance to 360 months. The court said that even if it erred in the obstructing-justice enhancement, "I would still say that I would come up with 360 months as an appropriate sentence."

Lewis appeals the sufficiency of evidence for his conviction, the denial of his motion for new trial based on newly discovered evidence, and his sentence.

II.

Lewis argues insufficient evidence supports his conviction. This court reviews "the sufficiency of the evidence de novo, considering the evidence in the light most favorable to the government and drawing all reasonable inferences in

favor of the verdict." ***United States v. White***, 962 F.3d 1052, 1055 (8th Cir. 2020). "A jury verdict will not lightly be overturned," and this court "will affirm if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." ***United States v. Bradshaw***, 955 F.3d 699, 704-05 (8th Cir. 2020) (cleaned up).

"To convict an individual of conspiracy to distribute a controlled substance under 21 U.S.C. § 846, the Government must prove (1) a conspiracy to distribute methamphetamine existed; (2) the defendant knew about the conspiracy; and (3) the defendant knowingly became a part of the conspiracy." ***Id.*** at 705 (internal quotations omitted). Lewis disputes the second and third elements.

Lewis argues that witnesses testifying about his involvement in the conspiracy lacked credibility because they cooperated with the government for reduced sentences and gave inconsistent testimony. Cooperating witnesses acknowledged they hoped for sentence reductions. Some testimony on drug quantities differed. "However, it is not this court's role to weigh the evidence or the credibility of the witnesses." ***Id.*** (internal quotations omitted) (holding there was sufficient evidence for a rational jury to find, beyond a reasonable doubt, that a defendant knew about and actively participated in a conspiracy to distribute meth). Instead, this court "must resolve credibility issues in favor of the verdict." ***Id.*** This court has "repeatedly upheld jury verdicts based solely on the testimony of conspirators and cooperating witnesses, noting it is within the province of the jury to make credibility assessments." ***United States v. Hamilton***, 929 F.3d 943, 946 (8th Cir. 2019) (rejecting defendant's attack on witnesses' credibility even though they testified in exchange for plea deals or sentence reductions and had previously lied to government officials).

The government corroborated the testimony with physical evidence. Law enforcement intercepted a package of meth sent by a coconspirator to Lewis. The government introduced records of phone calls and text messages to Lewis from coconspirators. *See **United States v. Mayfield***, 909 F.3d 956, 963 (8th Cir. 2018) (holding evidence of conspiracy to distribute meth was "more than sufficient" because circumstantial evidence, including phone records and other physical evidence, corroborated cooperating witnesses' testimony); ***United States v. Tillman***,

765 F.3d 831, 834 (8th Cir. 2014) (holding evidence of conspiracy to distribute meth was sufficient because phone records corroborated cooperating witnesses' testimony). Contrary to Lewis's assertion, the government proved more than mere knowledge of the existence of the conspiracy. *See United States v. Cabrera*, 116 F.3d 1243, 1244 (8th Cir. 1997) (requiring "knowing involvement and cooperation").

Sufficient evidence supports Lewis's conviction for conspiracy to distribute a controlled substance.

III.

Lewis argues the district court abused its discretion by denying his motion for new trial based on newly discovered evidence. "This court reviews a district court's denial of a motion for a new trial based on newly discovered evidence for clear abuse of discretion." *United States v. Shumaker*, 866 F.3d 956, 961 (8th Cir. 2017). "The standard for a new trial on this basis is 'rigorous' because these motions are 'disfavored.'" *Id.*, *quoting United States v. Dogskin*, 265 F.3d 682, 685 (8th Cir. 2001). A district court's determinations on the credibility of testimony in the evidentiary hearing on the new trial motion are reviewed for clear error. *Laird v. United States*, 987 F.2d 527, 529 (8th Cir. 1993).

A "district court may grant a new trial based on newly discovered evidence 'if the interest of justice so requires.'" *United States v. Glinn*, 965 F.3d 940 (8th Cir. 2020), *quoting* **Fed. R. Crim. P. 33(a)**. The movant must show "(1) the evidence is in fact newly discovered since trial; (2) diligence on his part; (3) the evidence is not merely cumulative or impeaching; (4) the evidence is material to the issues involved; and (5) it is probable that the new evidence would produce an acquittal at the new trial." *Shumaker*, 866 F.3d at 961. *See also United States v. Bell*, 761 F.3d 900, 911 (8th Cir. 2014) (same); *United States v. McColgin*, 535 F.2d 471, 476 (8th Cir. 1976) (same). The parties agree that here the first two elements are satisfied and dispute only the last three.

A.

Lewis's newly discovered evidence only impeached. *See **United States v. Anderson***, 783 F.3d 727, 752 (8th Cir. 2015) (holding that newly discovered evidence merely impeached witness because it contradicted her testimony); ***United States v. Hollow Horn***, 523 F.3d 882, 889-90 (8th Cir. 2008) (holding that newly discovered evidence that parents coached witness merely impeached her). Lewis offered an affidavit of an inmate, L.G., who overhead two government witnesses "comparing their stories of what they were going to testify to in court. . . . rehearsing their stories and . . . joking about how they were going to stick Robert Lewis with all of this." L.G. also heard one of them "talking to somebody on the phone and telling them what was going on in the courtroom that day," saying, "Lewis is really stupid and is going to get a lot more time in prison." L.G.'s affidavit would only impeach the witnesses, "which is insufficient to warrant a new trial." *See **United States v. Baker***, 479 F.3d 574, 577 (8th Cir. 2007) (holding affidavit from inmate who overheard witness contradicting testimony would only impeach). L.G.'s testimony at the evidentiary hearing—mostly contradicting his affidavit—also only impeached. *See **United States v. Johnson***, 450 F.3d 366, 373 (8th Cir. 2006) (holding inmate's testimony that he overheard a witness say he was paid to testify "would serve only to impeach").

B.

Because the newly discovered evidence only impeached, it was not material. "In order to meet the materiality requirement, newly discovered evidence must be more than merely impeaching." ***United States v. Meeks***, 742 F.3d 838, 841 (8th Cir. 2014) (cleaned up) (holding that evidence was not material because it would be offered only to impeach).

C.

It is not probable that, at a new trial, the newly discovered evidence would produce an acquittal. First, L.G.'s testimony and affidavit would not overcome the government's nine witnesses and physical evidence. *See **id.*** (holding impeachment evidence was "insufficient to show an acquittal would be likely" because other

evidence was overwhelming). The government offered at trial nine witnesses, phone records, video of a traffic stop, and the intercepted package of meth sent to Lewis by coconspirators.

Second, the affidavit was not credible because L.G. recanted significant parts of it. "Newly discovered evidence that is not credible is not likely to result in acquittal in a second trial, and therefore lack of credibility is sufficient grounds for denying a motion for a new trial." *United States v. Vazquez-Garcia*, 340 F.3d 632, 641 (8th Cir. 2003). Explaining his affidavit at the evidentiary hearing, L.G. testified that "some of the details in here are inaccurate"—including that he heard government witnesses "talking and comparing their stories of what they were going to testify to in court" was "inaccurate." He said that "the conspiring and rehearsing their stories, I don't remember them doing that." Instead, "What I heard was just they would come back from . . . court . . . and were just . . . comparing what had happened in the courtroom." He overheard them saying only "how stupid they thought Bob was. . . . just generally speaking," and not "specifically to an issue." L.G. testified he did not "specifically" hear the witnesses say that "they were going to stick Robert Lewis with all of this." Also, L.G. said the only phone call he overheard was one witness saying that "when they were in the courtroom or something when nobody was around or when everybody had their backs to him . . . [Lewis] mouthed the words 'I'm going to kill you'" to the witness. Jail call records also contradicted the affidavit.

Third, L.G. did not testify credibly. At the end of the hearing, the district court made a "factual finding" on his lack of credibility: "I don't believe a word [L.G.] said. I think he will say whatever is necessary depending on who is talking to him and how he thinks he might benefit at the time." L.G. "was a horrible witness. He had to think about everything. It appeared to me that he had perjury concerns running through his brain. . . . I've never seen a witness so unsure about how to answer even basic questions. My credibility finding at this point is basically [L.G.] has none." A district court's credibility determination is "virtually unreviewable on appeal." *United States v. Womack*, 191 F.3d 879, 885-86 (8th Cir. 1999) (holding district court did not clearly err in crediting government witnesses over defendant's witnesses at evidentiary hearing on newly discovered evidence). Based on the district court's observations of L.G.'s testimony, it did not clearly err in finding he

lacked credibility. If "a district court does not believe a witness, it seems most unlikely that the same court would find the witness sufficiently persuasive to enable the court to say that the witness's testimony would probably produce an acquittal at a new trial." *United States v. Grey Bear*, 116 F.3d 349, 351 (8th Cir. 1997) (holding newly discovered evidence was not likely to result in acquittal at a new trial because district court explained why witness was not credible). The newly discovered evidence was not likely to produce acquittal at a new trial.

## D.

Lewis contends that the newly discovered evidence involved perjury by government witnesses. A conviction obtained by the "knowing use of perjured testimony. . . . 'must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.'" *United States v. Duke*, 50 F.3d 571, 577 (8th Cir. 1995), *quoting United States v. Agurs*, 427 U.S. 97, 103 (1976). Before this court can apply this "relaxed standard," a defendant must establish "(1) the testimony was in fact perjured and (2) the prosecuting officers knew, or should have known, of the perjury at the time the testimony was presented." *Duke*, 50 F.3d at 577-78, *citing English v. United States*, 998 F.2d 609, 611 (8th Cir. 1993). Lewis provides no evidence that the testimony was in fact perjured. Nor does he provide evidence that the prosecutor knew, or should have known, of any perjury when the witnesses testified. *See English*, 998 F.2d at 611 (refusing to apply relaxed standard for perjury because defendant did not demonstrate "the requisite knowledge on the part of the prosecutors"). The standard for perjury by government witnesses does not apply to Lewis's newly discovered evidence.

The district court did not abuse its discretion by denying Lewis's motion for new trial based on newly discovered evidence.

## IV.

Lewis argues the district court applied the wrong guideline range for his sentence. This court reviews sentences for abuse of discretion. *United States v. Boyd*, 956 F.3d 988, 991 (8th Cir. 2020). This court reviews a sentence first "for significant procedural error and then, if necessary, for substantive reasonableness."

*Id.* "As relevant here, a procedural error occurs if the court improperly calculated the Guidelines range or selected the 'sentence based on clearly erroneous facts.'" *Id.*, *quoting* **United States v. Feemster**, 572 F.3d 455, 461 (8th Cir. 2009) (en banc). This court reviews "the district court's construction and application of the Guidelines de novo and its factual findings for clear error." **United States v. Carter**, 960 F.3d 1007, 1010 (8th Cir. 2020). Lewis disputes the amount of meth, manager role enhancement, obstructing-justice enhancement, and base offense level.

A.

Lewis argues the district court attributed too much meth to him. "To determine properly the applicable drug quantity in a conspiracy, a sentencing court shall approximate the quantity of the controlled substances for sentencing purposes if the amount of drugs seized does not reflect the scale of the offense." **United States v. Shaw**, 965 F.3d 921, 927 (8th Cir. 2020) (cleaned up). *See also* **United States v. Brown**, 19 F.3d 1246, 1248 (8th Cir. 1994). "In so doing, the court may make a specific numeric determination of quantity based on imprecise evidence and without regard to the admissibility of the evidence." **Shaw**, 965 F.3d at 927 (cleaned up). This court reviews for clear error a district court's drug quantity finding. *Id.* at 926. The government must prove drug quantity by a preponderance of the evidence. *Id.* *See also* **United States v. McMurray**, 34 F.3d 1405, 1414 (8th Cir. 1994).

Lewis contends the district court should have attributed to him only the meth he was responsible for distributing, not the entire amount in the shipments C.W. received. "For purposes of calculating drug quantity in a drug conspiracy case, the district court may consider amounts from drug transactions in which the defendant was not directly involved if those dealings were part of the same course of conduct or scheme." **United States v. King**, 898 F.3d 797, 809 (8th Cir. 2018) (cleaned up). "This includes all transactions known or reasonably foreseeable to the defendant that were made in furtherance of the conspiracy." *Id.* (internal quotations omitted). *See* **United States v. Moore**, 212 F.3d 441, 446 (8th Cir. 2000) (attributing to defendant drug quantities "that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense"), *quoting* **U.S.S.G. § 1B1.3(a)(1)(B)**. *See also* **United States v. Payton**, 636 F.3d 1027, 1046 (8th Cir. 2011).

The meth shipments received by C.W. were part of the same course of conduct or scheme as the conspiracy, reasonably foreseeable, and in furtherance of it. C.W. testified, "Ultimately, I was responsible for receiving all the methamphetamine, and I was responsible for paying for it." He said he received a six-to-ten-pound shipment each week. He gave Lewis half of it to "deliver to the certain people that he knew" and for personal use. This arrangement lasted a "couple months, three months," according to C.W. Their relationship ended because Lewis "wouldn't bring in the money, wouldn't keep track of who he took the ounces to," and did not repay C.W. for drugs Lewis kept for personal use. It "is well-established that the testimony of co-conspirators may be sufficiently reliable evidence upon which the court may base its drug quantity calculation for sentencing purposes." *United States v. Sainz Navarrete*, 955 F.3d 713, 720 (8th Cir. 2020). Finding C.W.'s testimony credible, the district court attributed 21.77 kilograms of meth to Lewis. A "district court's credibility determinations are virtually unreviewable on appeal." *United States v. Madison*, 863 F.3d 1001, 1005 (8th Cir. 2017). *See id.* at 1007 (holding district court did not clearly err in finding government witness more credible than defendant's witness when calculating drug quantity). Further, the district court noted that the jury found Lewis guilty after being instructed that a guilty defendant was "responsible for . . . any methamphetamine that fellow conspirators actually distributed or agreed to distribute during the conspiracy that was reasonably foreseeable as a necessary or natural consequence of the conspiracy." The district court did not err in attributing the meth shipments to Lewis.

Lewis disputes the shipments' amounts because a driver testified to different amounts than C.W. did. The district court credited C.W.'s testimony over the driver's. The district court did not clearly err in making this finding. *See Madison*, 863 F.3d at 1005.

The district court did not clearly err in the drug quantity attributed to Lewis.

B.

Lewis argues that the district court erred by applying a three-level manager or supervisor role enhancement. This enhancement applies if a defendant "was a 'manager or supervisor (but not an organizer or leader) and the criminal activity

involved five or more participants or was otherwise extensive.'" ***United States v. Guzman***, 946 F.3d 1004, 1008 (8th Cir. 2020), *quoting* **U.S.S.G. § 3B1.1(b)**. This court "has defined the terms 'manager' and 'supervisor' quite liberally." ***United States v. Davis***, 875 F.3d 869, 874 (8th Cir. 2017). A "defendant may be subject to the enhancement even if he managed or supervised only one participant, limited to a single transaction." ***Guzman***, 946 F.3d at 1008. "The key factors in determining management or supervisory authority are control over participants and organization of the criminal activity." ***Davis***, 875 F.3d at 874. *See also **United States v. Van Chase***, 137 F.3d 579, 583 (8th Cir. 1998); ***United States v. Del Toro-Aguilera***, 138 F.3d 340, 342 (8th Cir. 1998). "The government must prove the applicability of the enhancement by a preponderance of the evidence." ***Davis***, 875 F.3d at 874. *See also **United States v. Garcia-Hernandez***, 530 F.3d 657, 665 (8th Cir. 2008). "This court reviews a district court's factual findings regarding whether a leadership enhancement is warranted for clear error and its legal conclusions de novo." ***Davis***, 875 F.3d at 874.

Lewis contends he did not supervise other members of the conspiracy. A coconspirator testified he was Lewis's "taxi driver. If he needed to go somewhere, I gave him a ride. If he needed to drop some meth off or drugs off, I would give him a ride. Whatever he needed to do." C.W. testified he hired a second driver to take Lewis "around to deliver methamphetamine and pick up money." Thus, Lewis "directed and controlled" his drivers to transport him to deliver drugs "as part of the conspiracy." *See **United States v. Cole***, 657 F.3d 685, 687-88 (8th Cir. 2011) (holding district court did not clearly err in finding defendant was a manager or supervisor because he directed a coconspirator to drive him to deliver drugs). This supervision qualities Lewis for the three-level role enhancement. *See **Guzman***, 946 F.3d at 1008 (applying manager-or-supervisor enhancement based only on defendant's directing coconspirator to provide contact information of clients and pick up packages from the mail).

Lewis also argues he did not have any responsibility beyond distributing drugs. *See **United States v. Bryson***, 110 F.3d 575, 584 (8th Cir. 1997) (holding that "status as a distributor, standing alone, does not warrant an enhancement under § 3B1.1"). First, supervising his drivers qualifies him for the three-level enhancement. *See **Guzman***, 946 F.3d at 1008. Second, his coconspirators'

testimony shows that Lewis participated in planning the conspiracy. *See Davis*, 875 F.3d at 874 (noting that courts applying this enhancement consider "the degree of participation in planning or organizing the offense"), *citing* **U.S.S.G. § 3B1.1 cmt. n.4**. M.P., the meth supplier, testified he met Lewis when Blue Schmitt, then-leader of the enterprise, brought M.P. into his "circle of trust," introducing M.P. to Lewis and other friends. The group met to discuss how C.W. "was going to take over the enterprise" from Schmitt. C.W. "was going to get help from . . . Lewis." Lewis promised M.P. that he would "look out for – making sure that [C.W.] was doing things okay." According to M.P., Lewis meant "he would make sure that [C.W.] wouldn't overspend the money that was not his."

The district court did not clearly err in applying the manager-or-supervisor role enhancement.

## C.

Lewis argues the district court erred by applying a two-level enhancement for obstructing justice. A defendant with a role enhancement, like Lewis, receives an additional two-level enhancement if the "defendant engaged in witness intimidation, tampered with or destroyed evidence, or otherwise obstructed justice in connection with the investigation or prosecution of the offense. *See* **U.S.S.G. § 2D1.1(b)(16)(D)**.

Lewis argues he did not obstruct justice because the alleged intimidation happened after the witnesses testified at trial. This court need not address his argument because any error by the district court was harmless. *See United States v. Davis*, 583 F.3d 1081, 1095 (8th Cir. 2009) (declining to determine whether district court erred in finding defendant was a career offender because any error was harmless). Lewis's offense level with all enhancements would have been 45, but the guidelines limited it to 43. *See* **U.S.S.G. Ch. 5, Pt. A** (Sentencing Table). For an offense level of 43, the guidelines recommended a life sentence. *Id.* The district court granted Lewis a downward variance to 360 months. As the district court observed, even without the obstructing-justice enhancement, Lewis's offense level is 43. The district court said that even if it erred by applying this enhancement, "I would still say that I would come up with 360 months as an appropriate sentence."

Any error was harmless.  *See Davis*, 583 F.3d at 1095 (holding error was harmless because district court "explicitly stated" it would have imposed the same sentence regardless of whether defendant was a career offender).

## D.

Lewis argues that the district court should have rejected the guidelines range for meth because of a "policy disagreement."  He contends that the 10-to-1 ratio in the guidelines range between meth mixture and pure meth "is not based on empirical evidence."  He believes the district court should have calculated an "alternative" guidelines range using the base level for meth mixture, not pure meth.  The district court expressly considered this policy argument, apparently giving it some weight, which was within its discretion.  *See United States v. Sharkey*, 895 F.3d 1077, 1082 (8th Cir. 2018) (holding district court "was within its discretion" when it "expressly considered" the same policy argument and rejected it).  The district court did not err in determining Lewis's sentence.

\* \* \* \* \* \* \*

The judgment is affirmed.

_____